FILED
2022 Dec-09  AM 09:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SAMINA SIMONE NATAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:21-cv-1201-AMM** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

Plaintiff Samina Simone Natal brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.     Introduction

On December 27, 2019, Ms. Natal protectively filed an application for benefits under Title II of the Act, alleging disability as of July 1, 1994. R. 17, 57–67. Ms. Natal alleged disability due to muscolligamnetous strain/sprain of cervical spine, multiple disc protrusions at various levels, bulging disc at L4-5, issues with

her neck, and thyroid. R. 57. She has at least a high school education and past relevant work experience as a bus driver. R. 24–25.

The Social Security Administration ("SSA") initially denied Ms. Natal's application on March 6, 2020, and denied it upon reconsideration on July 17, 2020. R. 17, 57–80. On August 17, 2020, Ms. Natal filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 17, 108–09. That request was granted. R. 110–15. Ms. Natal received a telephone hearing before ALJ Patrick R. Digby on January 14, 2021. R. 17, 32–56. On March 8, 2021, ALJ Digby issued a decision, finding that Ms. Natal was not disabled from July 1, 1994 through the date of last insured. R. 14–26. Ms. Natal was sixty years old at the time of the ALJ decision. R. 25–26.

Ms. Natal appealed to the Appeals Council, which denied her request for review on July 8, 2021. R. 2–4. After the Appeals Council denied Ms. Natal's request for review, R. 2–4, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On September 2, 2021, Ms. Natal sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.    The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work

activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id. Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of

performing past relevant work, then the claimant is deemed not disabled. *Id*. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Ms. Natal would meet the insured status requirements of the Act through March 31, 2019. R. 17, 19. Next, the ALJ found that Ms. Natal "worked from the alleged onset date of July 1, 1994 through October 2014." R. 19. The ALJ explained that it was "not necessary to determine whether that work activity constitutes disqualifying substantial gainful activity because, even assuming that it was not substantial gainful activity, there exists a valid basis for denying [Ms. Natal's] application." R. 19. The ALJ decided that Ms. Natal had the following severe impairments: degenerative disc disease/lumbago. R. 20. The ALJ found that Ms. Natal's obesity, hypothyroidism, degenerative joint disease of the left knee, hyperlipidemia, and diverticulitis were not severe impairments because they

4

did not "preclude work-related activities, or satisfy the durational requirements for the purpose of disability." R. 20. Overall, the ALJ determined that Ms. Natal did not have "an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" to support a finding of disability. R. 20.

The ALJ found that Ms. Natal's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 21. The ALJ found that Ms. Natal had the "residual functional capacity to perform less than the full range of medium work." R. 20. The ALJ determined that Ms. Natal could: occasionally lift and/or carry, including upward pulling of fifty pounds; frequently lift and/or carry, including upward pulling of twenty-five pounds; sit for six hours in an eight-hour workday with normal breaks; stand and/or walk for six hours in an eight-hour workday with normal breaks; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. R. 20. The ALJ found that Ms. Natal's ability to push and/or pull, including operation of hand or foot controls is unlimited up to the lift and carry restrictions of fifty and twenty-five pounds. R. 20. The ALJ prohibited work at ladders, ropes, scaffolds, or unprotected heights. R. 20.

The ALJ enlisted a vocational expert to identify the past relevant work performed by Ms. Natal. R. 24. The vocational expert testified that Ms. Natal's past

relevant work was that of a bus driver. R. 24. The ALJ determined Ms. Natal is "capable of performing past relevant work as a bus driver." R. 24.

According to the ALJ, Ms. Natal is "an individual of advanced age" and has "at least a high school education," as those terms are defined by the regulations. R. 25. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Ms. Natal] is 'not disabled,' whether or not [Ms. Natal] has transferable job skills." R. 25 (cleaned up). Because Ms. Natal's "ability to perform all or substantially all of the requirements of [medium] work was impeded by additional limitations," the ALJ enlisted a vocational expert to ascertain whether there are a significant number of jobs in the national economy that Ms. Natal is capable of performing. R. 25. That expert concluded that there are indeed a significant number of such jobs in the national economy, such as a dining-room attendant, hand packager, and cook helper. R. 25–26.

Based on these findings, the ALJ concluded that Ms. Natal was not under a disability as defined in the Act, from July 1, 1994, through March 31, 2019, the date of last insured. R. 17–18, 26. Ms. Natal now challenges that decision.

## III. Factual Record

The medical records in the record span many years and cover various complaints. Ms. Natal's records first reveal an injury to her cervical and lumbar spine

in a 1994 work accident. R. 397–419, 424. However, Ms. Natal amended her alleged onset date to July 11, 2018 at the ALJ hearing. R. 35. Also, Ms. Natal's arguments relate to her back and knee pain and resulting limitations and her obesity. *See e.g*., Doc. 8 at 6. Therefore, the court's review of the medical records will relate to the relevant time period and relevant medical complaints.

Ms. Natal underwent an MRI of her lumbar spine on July 11, 2018, because of her history of low back pain and two months of bilateral hip pain. R. 391. The findings were:

> Alignment: Normal.
> Vertebrae: No significant abnormality.
> Visualized cord: No significant abnormality. Conus terminates at L1.
>
> L1–2: No significant disc abnormality, spinal canal or neural foraminal stenosis.
>
> L2–3: Broad-based disc bulge asymmetric in the left paracentral region. Mild disc desiccation. No spinal stenosis or neuroforaminal narrowing.
>
> L3–4: Disc desiccation. Broad-based disc bulge. No spinal stenosis or neuroforaminal narrowing.
>
> L4–5: Disc desiccation. Broad-based disc bulge asymmetric in the left paracentral and foraminal region. Left neural foraminal narrowing. Mild disc desiccation.
>
> L5–S1: Central disc bulge. No spinal stenosis or neuroforaminal narrowing.

R. 391. Overall, the MRI found "[m]ultilevel disc disease." R. 391.

Ms. Natal presented to Dr. Norman McCoomer of Pain & Rehabilitation Consultants on August 21, 2018 for "low back, hip[,] and lower extremity pain." R. 424. Ms. Natal reported that "her pain started in June 2018 after she started playing [pickleball]." R. 424. Ms. Natal informed Dr. McCoomer that she originally saw a chiropractor, where she was receiving relief, but her insurance limited covered visits. R. 425. Ms. Natal also visited Sportsmed, and she was advised to undergo an MRI, sent to physical therapy, and referred to Dr. McCoomer for a cortisone shot. R. 425. At the time, Ms. Natal was using Aleve for increased pain, but had not tried pain medication, neuropathic medication, muscle relaxers, or other NSAIDS. R. 425. Dr. McCoomer reviewed Ms. Natal's symptoms and determined that she had no muscle weakness, no muscle cramps, no localized joint pain, and no joint swelling, but that she did suffer from muscle aches. R. 426. Ms. Natal's posture, gait, and stance were abnormal. R. 426. The physical exam also revealed the following related to Ms. Natal's back and leg problems:

> **Cervical Spine Exam:** no cervical spine lordosis; no asymmetry, contracture, laxity or fasciculations; not spinous process; not trapezius muscle;
> . . . .
> **Thoracic Spine Exam: thoracic spine tenderness to palpation;**
> . . . .
> **Lumbar Spine Inspection/Palpation:** no asymmetry, defects, contracture, laxity or fasciculations; normal curvature; **palpation of lumbosacral spine abnormal; lumbosacral spine tenderness on palpation of spinous process; tenderness on palpation of right sacroilliac**

**joint; tenderness on palpation of left sacroilliac joint; tenderness on palpation of right buttock; tenderness on palpation of left buttock;**

. . . .

**Lumbar Spine Neuro:** . . . **compression test positive at right sacroiliac joint; compression test positive at left sacroiliac joint;**

**Non-Physiologic Lumbar Spine: lumbosacral spine tenderness on palpation;**

**Lower Extremity Inspection/Palpation:** . . . **tenderness on palpation of right greater trochanter; tenderness on palpation of left greater trochanter; tenderness on palpation of right hip; tenderness on palpation of left hip;**

. . . .

**Lower Extremity Motor exam:** muscle tone normal; muscle bulk normal; **lower extremity strength abnormal[.]**

R. 426–27. Dr. McCoomer also completed a pain assessment, and recorded Ms.

Natal's pain level as a 6. R. 428. He wrote that her pain was located in her "low

back, hip, and lower extremities" and was "chronic[,] . . . sharp, achy, [and]

burning." R. 428. Dr. McCoomer's established plan of care included "medication

management, injection therapy[,] and physical therapy," specifically "sacroiliac

joint injection with a sciatic nerve block." R. 430. Dr. McCoomer advised Ms. Natal

"to continue taking NSAIDS over the counter" and advised her to take 800 mg of

Ibuprofen or Mobic 15 once a day. R. 430. Ms. Natal was scheduled for two

injections and for a return visit in September 2018. R. 430. She was also advised to

continue her "home exercises and daily stretches." R. 430.

Ms. Natal received a left sacroiliac joint injection with left sciatic nerve block on August 31, 2018. R. 463.

Ms. Natal returned to Dr. McCoomer on September 4, 2018 for "right [sacroiliac joint injection] with right sciatic [nerve block]." R. 432. At this visit, Ms. Natal stated "her worst area of pain today is midline low back radiating to bilateral hips." R. 432. She also reported "radiating pain to bilateral lower extremities (posterior thigh stopping above the knees)" and "constant" pain "with increased activity, sharp, stabbing, and burning with no numbness or tingling present in the lower extremity." R. 432. Ms. Natal reported pain in her lower back, the soft tissue of her hips, buttock, and thigh. R. 433. Ms. Natal said her lower back pain was worse when "bending forward," but it was better with relaxation techniques, analgesics, heat, and bedrest. R. 433. Dr. McCoomer reviewed Ms. Natal's symptoms and determined that she had no muscle weakness, no muscle cramps, no localized joint pain, and no joint swelling, but that she did suffer from muscle aches. R. 434. Ms. Natal's posture, gait, and stance were abnormal. R. 434. The physical exam also revealed the following related to Ms. Natal's back and leg problems:

> **Cervical Spine Exam:** no cervical spine lordosis; no asymmetry, contracture, laxity or fasciculations; not spinous process; not trapezius muscle;
> . . . .
> **Thoracic Spine Exam: thoracic spine tenderness to palpation;**
> . . . .

**Lumbar Spine Inspection/Palpation:** no asymmetry, defects, contracture, laxity or fasciculations; normal curvature; **palpation of lumbosacral spine abnormal; lumbosacral spine tenderness on palpation of spinous process; tenderness on palpation of right sacroilliac joint; tenderness on palpation of left sacroilliac joint; tenderness on palpation of right buttock; tenderness on palpation of left buttock;**
. . . .
**Lumbar Spine Neuro:** . . . **compression test positive at right sacroiliac joint; compression test positive at left sacroiliac joint;**

**Non-Physiologic Lumbar Spine: lumbosacral spine tenderness on palpation;**

**Lower Extremity Inspection/Palpation:** . . . **tenderness on palpation of right greater trochanter; tenderness on palpation of left greater trochanter; tenderness on palpation of right hip; tenderness on palpation of left hip;**
. . . .
**Lower Extremity Motor exam:** muscle tone normal; muscle bulk normal; **lower extremity strength abnormal[.]**

R. 434–35. Dr. McCoomer also completed a pain assessment, and recorded Ms. Natal's pain level as a 6. R. 436. He wrote that her pain was located in her "low back, hip, and lower extremities" and was "chronic[,] . . . sharp, achy, [and] burning." R. 436.

Dr. McCoomer referred Ms. Natal to Dr. Jason Banks at Huntsville Hospital Spine and Neuro. R. 444. Ms. Natal presented to Dr. Banks on November 19, 2018 complaining of lumbar radiculopathy. R. 444. Ms. Natal reported intermittent,

11

moderate pain in her low back and legs since April 2018 that she described as

"pressure, throbbing, tension, burning, dull ache, stabbing, [and] cramping." R. 444.

Ms. Natal also reported difficulty walking and muscle pains or cramps. R. 445. Ms.

Natal's musculoskeletal physical exam showed:

> Posture is normal.
> Gait is non-antalgic and without assistive device.
> Heel to toe walking-normal.
> Range of motion of the lumbar spine is normal.
> Palpation of lumbar spine reveals no tenderness.
> Sacroiliac joint tenderness is mildly present on the left.
> Greater trochanteric bursa tenderness is absent bilaterally.
> Straight leg raise is negative bilaterally.
> Pain with hip rotation is negative bilaterally.

R. 446. Dr. Banks reported that Ms. Natal's pain had lasted for three months and

"radiates down the back of her hips, buttocks, and thighs, mostly to her knees." R.

446. Ms. Natal reported worse pain after playing pickleball. R. 446. Ms. Natal

reported that the injection by Dr. McCoomer gave her "some short-term relief," and

that she had also seen a chiropractor. R. 446. Dr. Banks noted that Ms. Natal could

"bend forward and touch the floor with her palms flat." R. 447. He also noted that

"x-rays ordered and interpreted . . . show a mild spondylolisthesis of L4-5 without

obvious motion on flexion/extension." R. 447. Dr. Banks also noted that Ms. Natal's

"MRI scan of the lumbar spine shows lateral recess stenosis of L4-5 without obvious

or severe spinal canal compression. The L3-4, L5-S1 regions look normal." R. 447.

Dr. Banks did not recommend surgery, but did recommend glucosamine and Mobic,

and reported that Ms. Natal was willing to take turmeric as well. R. 447. Ms. Natal received a referral to physical therapy for her lumbar spine, stated she would continue chiropractic treatments, and reported she would return to Dr. McCoomer for a possible epidural steroid injection of L4-5. R. 447, 449.

Ms. Natal received a left sacroiliac joint injection with left sciatic nerve block on January 3, 2019. R. 462.

Ms. Natal presented to Dr. McCoomer on January 14, 2019 to follow up for "low back, hip[,] and lower extremity pain." R. 462. Ms. Natal reported 75% relief after her left sacroiliac joint injection with left sciatic nerve block, being able to walk better, and enjoying pickleball with a decreased pain level. R. 462. Ms. Natal reported that her worst pain was in her bilateral hips and buttocks, "with radiating pain in the posterior thighs." R. 462. "She describe[d] her pain as constant, sharp[,] and throbbing[,]" and "report[ed] an increase in pain with activity[ and] bending forward." R. 462. Ms. Natal reported minimal relief from Mobic 7.5 mg and wanted to discuss getting a transforaminal. R. 462. Ms. Natal reported that her pain was aching, sharp, burning, throbbing, stabbing, and usually present, but was helped with relaxation techniques and analgesics. R. 463. Ms. Natal stated that her sacroiliac joint injections with sciatic nerve blocks in August 2018 and September 2018 provided fifty to sixty percent relief. R. 463. She also stated that her left sacroiliac joint injection with sciatic nerve block on January 3, 2019 provided seventy-five

percent relief that continued at the visit. R. 463. However, she stated she only received "minimal relief" from a recent caudal. R. 468. Dr. McCoomer reviewed Ms. Natal's symptoms and determined that she had no muscle weakness, no muscle cramps, no localized joint pain, and no joint swelling, but that she did suffer from muscle aches. R. 464. Ms. Natal's posture, gait, and stance were abnormal. R. 464. The physical exam also revealed the following related to Ms. Natal's back and leg problems:

> **Cervical Spine Exam:** no cervical spine lordosis; no asymmetry, contracture, laxity or fasciculations; not spinous process; not trapezius muscle;
> . . . .
> **Thoracic Spine Exam: thoracic spine tenderness to palpation;**
> . . . .
> **Lumbar Spine Inspection/Palpation:** no asymmetry, defects, contracture, laxity or fasciculations; normal curvature; **palpation of lumbosacral spine abnormal; lumbosacral spine tenderness on palpation of spinous process; tenderness on palpation of right sacroilliac joint; tenderness on palpation of left sacroilliac joint; tenderness on palpation of right buttock; tenderness on palpation of left buttock;**
> . . . .
> **Lumbar Spine Neuro:** . . . **compression test positive at right sacroiliac joint; compression test positive at left sacroiliac joint;**
>
> **Non-Physiologic Lumbar Spine: lumbosacral spine tenderness on palpation;**
>
> **Lower Extremity Inspection/Palpation:** . . . **tenderness on palpation of right greater trochanter; tenderness on palpation of left greater trochanter; tenderness on**

> **palpation of right hip; tenderness on palpation of left hip;**
> . . . .
> **Lower Extremity Motor exam:** muscle tone normal; muscle bulk normal; **lower extremity strength abnormal[.]**

R. 464–65. Dr. McCoomer also completed a pain assessment, and recorded Ms. Natal's pain level as a 10. R. 466. He wrote that her pain was located in her "low back, hip, and lower extremity" and was "chronic[,] . . . sharp, stabbing[,] and throbbing." R. 466. Dr. McCoomer's plan of care included "injection therapy and physical therapy," including a scheduled right sacroiliac joint injection with right sciatic nerve block for January 2019. R. 468–69.

Ms. Natal received a right sacroiliac joint injection with right sciatic nerve block on January 17, 2019. R. 470.

Ms. Natal presented to Dr. McCoomer on February 18, 2019 to follow up for "low back, hip[,] and lower extremity pain." R. 470. Ms. Natal reported seventy-five to eighty percent relief from her right sacroiliac joint injection with right sciatic nerve block. R. 470.  Ms. Natal reported that her worst pain was in her "bilateral lower extremities (posterior thigh)." R. 470. "She describe[d] her pain as constant, sharp[,] and throbbing[,]" and "report[ed] an increase in pain with activity[ and] bending forward." R. 470. Ms. Natal reported minimal relief from Mobic 7.5 mg. R. 470. Ms. Natal reported that she had "been able to increase activity level without increase in pain." R. 470. Ms. Natal reported that her pain was aching, sharp,

burning, throbbing, stabbing, and usually present, but was helped with relaxation

techniques and analgesics. R. 471. Dr. McCoomer reviewed Ms. Natal's symptoms

and determined that she had no muscle weakness, no muscle cramps, no localized

joint pain, and no joint swelling, but that she did suffer from muscle aches. R. 472.

Ms. Natal's posture, gait, and stance were abnormal. R. 472. The physical exam also

revealed the following related to Ms. Natal's back and leg problems:

> **Cervical Spine Exam:** no cervical spine lordosis; no asymmetry, contracture, laxity or fasciculations; not spinous process; not trapezius muscle;
> . . . .
> **Thoracic Spine Exam: thoracic spine tenderness to palpation;**
> . . . .
> **Lumbar Spine Inspection/Palpation:** no asymmetry, defects, contracture, laxity or fasciculations; normal curvature; **palpation of lumbosacral spine abnormal; lumbosacral spine tenderness on palpation of spinous process; tenderness on palpation of right sacroilliac joint; tenderness on palpation of left sacroilliac joint; tenderness on palpation of right buttock; tenderness on palpation of left buttock;**
> . . . .
> **Lumbar Spine Neuro:** . . . **compression test positive at right sacroiliac joint; compression test positive at left sacroiliac joint;**
>
> **Non-Physiologic Lumbar Spine: lumbosacral spine tenderness on palpation;**
>
> **Lower Extremity Inspection/Palpation:** . . . **tenderness on palpation of right greater trochanter; tenderness on palpation of left greater trochanter; tenderness on palpation of right hip; tenderness on palpation of left hip;**

. . . .

> **Lower Extremity Motor exam:** muscle tone normal; muscle bulk normal; **lower extremity strength abnormal[.]**

R. 472–73. Dr. McCoomer also completed a pain assessment, and recorded Ms. Natal's pain level as a 10. R. 474. He wrote that her pain was located in her "low back, hip[,] and lower extremity" and was "chronic[,] . . . sharp, stabbing[,] and throbbing." R. 474. Dr. McCoomer's plan of care included "injection therapy and physical therapy," and stated that Ms. Natal "will call to schedule injection when needed (due to balance) that will then be followed by followup." R. 476. Dr. McCoomer noted that Ms. Natal was not currently taking medications. R. 476.

Ms. Natal presented to CRNP Jessica Walters on January 16, 2019 to establish care. R. 481. CRNP Walters noted that Ms. Natal "has a history of sciatica that is being treated with steroid shots by Dr. McCoomer," and "take[s] Mobic as needed for back pain as well as tumeric, fish oil, and magnesium." R. 481. Ms. Natal reported exercising two to three times per week. R. 481. CRNP Walter's exam revealed normal gait, and CRNP Walters recommended that Ms. Natal continue to follow up with Dr. McCoomer "for pain management." R. 482–83.

CRNP Walters treated Ms. Natal again on February 1, 2019, and again reported normal gait. R. 485.

Ms. Natal presented to CRNP Walters on May 14, 2019. R. 487. The records indicate that Ms. Natal "sees Dr. McCoomer for pain and rehab and epidurals for

back and knee pain. She continues to have problems with her back and knees. She has tried physical therapy but is not interested in trying that right now though." R. 487. CRNP Walters's exam revealed normal gait, and Ms. Natal was to call if she decided "to get in with ortho for pain." R. 488–89.

Ms. Natal presented to CRNP Walters on June 24, 2019 "with complaints of left knee pain for several months." R. 490. The records indicate that Ms. Natal "has fallen on [her knee two] times in the past [two] months. She denies any redness or swelling. She reports something feels loose. She has tried tumeric, Aleve, and ice. She has also tried stretches." R. 490. CRNP Walters's exam revealed normal gait, and she referred Ms. Natal for an x-ray of her left knee. R. 491–92. Ms. Natal was advised to take Mobic for one week. R. 492. The left knee x-ray found: "Moderate medial and patellofemoral degenerative changes. There is no fracture or suspicious bone lesion. No abnormal calcifications are noted." R. 507.

Ms. Natal presented to CRNP Walters on July 30, 2019 "for left lower extremity swelling" that lasted at least one week. R. 493. Ms. Natal reported pain "behind her left knee and into her left calf," "some heat, a sensation of feeling hot, and swelling in that area." R. 493. Ms. Natal reported that the pain was worse with movement and that nothing was making it better. R. 493. CRNP Walters's exam revealed normal gait, and she referred Ms. Natal for a venous and arterial ultrasound. R. 494–95. The venous ultrasound found: "No sonographic evidence of deep venous

18

thrombosis. Probable hematoma." R. 508. The arterial ultrasound found: "Negative for hemodynamically significant stenosis." R. 510.

Ms. Natal presented to Dr. Sunitha A. Ghanta on June 16, 2020 to establish care. R. 545. She stated that she walks for exercise four times a week and stretches daily. R. 545. The general exam revealed normal range of motion, normal strength, and "[n]o pain with palpitation." R. 546.

Ms. Natal presented to Dr. Ghanta on July 9, 2020 complaining of "intermittent pain to lower back, hips[,] and knees after exercise, sitting[,] or standing for long period of time. She describe[d] pain as an ache usually a 4/5 out of 10 on pain scale, lasting for several hours after the activity." R. 549. Ms. Natal reported taking Meloxicam 15 mg and CBD gel caps and that "both relieve her pain well." R. 549. She also reported "us[ing] stretches learned in PT daily to help relieve aches." R. 549. Ms. Natal reported that she walks four times a week and stretches daily. R. 549. The general exam revealed normal range of motion, normal strength, normal gait, and "[n]o pain with palpitation." R. 550. Ms. Natal refused physical therapy. R. 551.

Ms. Natal presented to Dr. Matthew Owen at SportsMed on November 11, 2020 "with left hip pain and radiating pain down the posterior aspect of the left leg." R. 576. Ms. Natal reported "back problems in the past" for which she has tried medications, physical therapy, and a home exercise program. R. 576. Ms. Natal

reported that she "takes walks daily and tries to play pickle ball." R. 576. The physical exam revealed: "Left lower extremity with full range of motion and strength. 2+ pulses to bilateral ankles and knees. No midline back tenderness. Positive straight leg raise." R. 577. X-rays of her hips were obtained and showed "[n]o significant hip arthritis." R. 577–78. Dr. Owen described Ms. Natal's diagnosis as "L4 on L5 anterolateral spinal listhesis with radicular type symptoms on the posterior aspect of the left leg." R. 578. Dr. Owen recommended an MRI of the lumbar spine. R. 578.

Ms. Natal underwent an MRI of her lumbar spine on November 17, 2020. R. 586. The findings were:

> Alignment: There is approximately 2 mm anterolisthesis of L4 on L5.
> Vertebrae: There is minimal bone marrow endplate reactive change along the inferior endplate of L5 and superior endplate of T12.
> Visualized cord: No significant abnormality. Conus terminates at L1.
>
> L1-2: Minimal posterior disc bulge causes minimal flattening of the ventral thecal sac.
>
> L2-3: Minimal posterior disc bulge causes minimal flattening of the ventral thecal sac.
>
> L3-4: Minimal posterior bulge causes minimal flattening of the ventral thecal sac.
>
> L4-5: Anterolisthesis and mild posterior disc bulge causes flattening of the ventral thecal sac. There is moderate degenerative facet disease. Overall, there is moderate

> canal stenosis, which appears slightly increased from
> prior.
>
> L5-S1: Mild posterior disc bulge causes flattening of the
> ventral thecal sac. There is mild degenerative facet
> disease.

R. 586. The impression was: "Multilevel degenerative disc and facet disease. There

is moderate canal stenosis at L4-L5, which appears slightly increased from prior."

R. 586.

Ms. Natal returned to SportsMed and saw Dr. Sanat Dixit on November 23,

2020 "for a follow up evaluation for L4-5 spondylolisthesis." R. 569. Ms. Natal

complained of "low back pain, described as a tightness, aching[,] and stiffness with

sporadic radiating leg pain wors[e] on the left leg than the right leg." R. 569. Ms.

Natal reported noticing "more in the way of radiating buttock, thigh[,] and leg

discomfort now that previously noted." R. 569. The physical exam revealed:

> APPEARANCE: Normal alignment. S sitting posture is
> fair. No scoliosis evident. No muscle atrophy or evidence
> of scapular winging.
>
> PALPATION: Mild tenderness in the lower lumbar region
>
> MSK: Straight leg raise is negative. Patrick's maneuver is
> equivocal on the left and negative on the right
>
> RANGE OF MOTION: Restricted with back extension

R. 571. Dr. Dixit reviewed the imaging and wrote, "Lumbar MRI scan shows a grade

1 spondylolisthesis with partial unroofing of the L4-5 disc and severe L4-L5 stenosis

with severe facet hypertrophy. Compared to the prior MRI scan from 2018, the spinal stenosis appears to progress slightly." R. 571. Dr. Dixit referred Ms. Natal for an L4-5 epidural steroid injection. R. 571.

Ms. Natal presented for a lumbar epidural steroid injection on December 3, 2020. R. 566.

Ms. Natal followed up through a telemedicine visit with Dr. Dixit on December 15, 2020. R. 560. Ms. Natal reported a fifty percent improvement with the epidural steroid injection. R. 560. Ms. Natal reported that "the majority of the related pain has now shifted to her axial low back region w/ minimal s/s affecting the bilateral lower extremities." R. 560. Ms. Natal prefers "more natural remedies" for pain relief and had been taking "an over-the-counter all-natural 'Heal and sooth[e]' oral pill" instead of Aleve or Tylenol. R. 560. Dr. Dixit noted that his plan was to refer Ms. Natal "for lumbar facet injections at L4-5." R. 562.

## IV.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are

conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## V.    Discussion

Ms. Natal alleges that the ALJ's decision should be reversed and remanded because: (1) the residual functional capacity is not supported by substantial evidence; (2) the ALJ improperly applied the pain standard; and (3) the ALJ did not properly consider her obesity. Doc. 8 at 5, 14, 16.

## A. The ALJ's Development of the Residual Functional Capacity

Social Security Ruling 96-8p ("SSR 96-8p") regulates the ALJ's assessment of a claimant's residual functional capacity. Under SSR 96-8p, the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p at *1, 1996 WL 374184 (July 2, 1996). The ruling specifically mandates a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's residual functional capacity must: "Contain a thorough discussion and analysis of the objective medical and other evidence . . . ; Include a resolution of any inconsistencies in the evidence as a whole; and Set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work." *Id.*

The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in his findings with respect to a claimant's "functional limitations and work-related abilities on a function-by-function basis," those findings nonetheless satisfy the requirements of SSR 96-8p if the ALJ considered all of the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009) (an ALJ's finding is sufficiently detailed despite lacking an express discussion of every function if there is substantial evidence supporting the ALJ's residual functional capacity assessment). In addition, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to allow the court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

Ms. Natal *first* argues that "a medium [residual functional capacity] is not consistent with objective evidence documenting Ms. Natal's pain-causing impairments," specifically "pain from her degenerative disc disease of the lumbar spine with L4-5 neural foraminal narrowing." Doc. 8 at 6, 20. *Second*, Ms. Natal argues the residual functional capacity "lacks appropriate accommodations for degenerative changes of the left knee and obesity, which the ALJ incorrectly found to be non-severe impairments." *Id*. at 6. *Third*, Ms. Natal argues that the medical records "point to an individual who would almost certainly be incapable of

performing the requisite lifting, as well as possibly the frequent standing, walking, bending, and stooping required to perform work at a medium level of exertion." *Id.* at 19.

After step three in the sequential evaluation, the ALJ carefully considered the "entire record" when forming Ms. Natal's residual functional capacity. R. 20. The ALJ stated that he found that, through the date of last insured (March 31, 2019), Ms. Natal had the residual functional capacity to:

> perform less than the full range of medium work as defined in 20 CFR 404.1567(c) except occasionally lift and/or carry, including upward pulling of fifty pounds, and can frequently lift and/or carry including upward pulling of twenty-five pounds. [Ms. Natal] can sit for six-hours in an eight-hour workday with normal breaks, and stand and/or walk with normal breaks for six hours in an eight-hour workday. [Ms. Natal's] ability to push and/or pull, including operation of hand or foot controls is unlimited up to the lift and carry restrictions of fifty and twenty-five pounds. [Ms. Natal] can frequently climb ramps and stairs, balance, stoop, kneel, crouch[,] and crawl. No work at ladders, ropes or scaffolds, unprotected heights.

R. 20. The ALJ summarized Ms. Natal's hearing testimony and the medical evidence of record. R. 21–23. Then the ALJ fully considered the medical opinions and prior administrative medical findings of Dr. Richard Walker and Dr. Robert Haas. R. 24.

With respect to Ms. Natal's physical limitations, the ALJ concluded:

> In conclusion, the records clearly show [Ms. Natal] has multilevel lumbar disc disease, bilateral sacroiliitis, osteoarthritis, and lumbago. However, during the relevant period she was treated conservatively with medication,

> physical therapy, chiropractic manipulation[,] and
> epidural steroid injections. There is no evidence she has
> ever required any type of surgery or that any has been
> recommended. [Ms. Natal] also testified at the hearing that
> she does not take any type of pain medication but rather
> all natural supplements. Furthermore, there is no evidence
> Dr. McCoomer or Dr. Banks gave her any restrictions or
> limitations regarding work activity or daily activities.
>
> Therefore, the undersigned finds that the severity of these
> impairments would not preclude her from performing
> work activity within the above residual functional capacity
> through the date of last insured (March 31, 2019).

R. 23. The ALJ also stated:

> In summary, the evidence suggests that [Ms. Natal] is
> limited, but she is able to perform the work of a medium
> exertional level. The objective medical evidence outlined
> above supports this conclusion. While [Ms. Natal] may not
> be able to perform work activity requiring a greater level
> of exertion, she could none-the-less perform work within
> the residual functional capacity stated above. The record
> as a whole to the contrary does not support [Ms. Natal's]
> allegations.

R. 24.

Although Ms. Natal argues that the ALJ erred by omitting limitations caused

by severe pain, Doc. 8 at 6, 20, as discussed below, the ALJ complied with the

Eleventh Circuit's pain standard. *See infra* Section V.B. Additionally, as discussed

below, the ALJ properly considered Ms. Natal's obesity. *See infra* Section V.C. To

the extent Ms. Natal argues that the residual functional capacity ignores left knee

problems, except for radiating pain from her back problems, the medical records

refer to knee pain *after* the relevant period. *See e.g.,* R. 487–92, 549. Additionally, post-relevant period imaging showed no more than moderate changes to Ms. Natal's knee. R. 507. And, the record includes numerous references to Ms. Natal's daily walks, pickleball games, and care for her husband and brother. *See, e.g.*, R. 576. The residual functional capacity included a function-by-function discussion. The ALJ's discussion was well-reasoned and thoroughly captured the medical evidence of record. Therefore, the court concludes that that ALJ's formation of Ms. Natal's residual functional capacity is supported by substantial evidence.

### B. The ALJ's Application of the Pain Standard

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. § 404.1529(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 404.1529(a), (b); Social Security Ruling 16-3p, 2017

28

WL 5180304, at *3–*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on her ability to work. *See* 20 C.F.R. § 404.1529(c); *Wilson*, 284 F.3d at 1225–26. In evaluating the extent to which a claimant's symptoms affect her capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. § 404.1529(c)(3), (4); SSR 16-3p at *4, *7–*8. The controlling regulations specifically list daily activities as a factor to consider in evaluating a claimant's credibility regarding his symptoms. 20 CFR § 404.1529(c)(3)(i). Additionally, an ALJ is entitled to consider a claimant's daily activities at Step Four. *See Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987). To discredit a claimant's statements, the ALJ must clearly "articulate explicit and adequate reasons." *See Dyer*, 395 F.3d at 1210 (cleaned up).

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid

requirement that the ALJ specifically refer to every piece of evidence in his decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.*

A credibility determination is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014); *see Hand v. Heckler*, 761 F.2d 1545, 1548–49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D.F.L. 1996) (holding that the ALJ's failure to articulate adequate reasons for only partially crediting the plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

*First*, Ms. Natal argues that the ALJ erred because there is substantial evidence that she satisfied the pain standard with her imaging, treatment, medical signs, and symptoms which indicate severe pain. Doc. 8 at 9–10. *Second*, Ms. Natal argues that the ALJ erred by "recit[ing] evidence from Ms. Natal's record in a

manner that emphasized unfavorable elements while minimizing evidence of Ms. Natal's limitations." *Id.* at 11.

After delineating the pain standard, the ALJ noted that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." R. 21. When describing Ms. Natal's symptoms, the ALJ wrote:

> At the hearing, [Ms. Natal] alleged an inability to work because of back pain. However, she can take care of her husband, who is on dialysis and her special needs brother with Down's syndrome. When helping them, she has to stop and take a break for ten to fifteen minutes. During this break, she sits down and elevates her feet until the pain stops. She stopped working as a bus driver to take care of her husband and brother. She takes all natural supplements for pain.

R. 21.

The ALJ considered the objective medical evidence during the relevant period from Dr. McCoomer, Dr. Banks, and CRNP Walters. R. 22–23. After considering this medical evidence, the ALJ concluded that

> the records clearly show [Ms. Natal] has multilevel lumbar disc disease, bilateral sacroiliitis, osteoarthritis, and lumbago. However, during the relevant period she was treated conservatively with medication, physical therapy, chiropractic manipulation[,] and epidural steroid injections. There is no evidence she has ever required any

type of surgery or that any has been recommended. [Ms. Natal] also testified at the hearing that she does not take any type of pain medication but rather all natural supplements. Furthermore, there is no evidence Dr. McCoomer or Dr. Banks gave her any restrictions or limitations regarding work activity or daily activities.

Therefore, the undersigned finds that the severity of these impairments would not preclude her from performing work activity within the above residual functional capacity through the date of last insured (March 31, 2019).

R. 23.

In analyzing Ms. Natal's subjective complaints and hearing testimony, the ALJ clearly discussed the objective medical evidence such as the specific visits related to her degenerative disc disease, including her statements at those visits and physical examination results, treatments measures, medication, and imaging results. R. 22–23. Ms. Natal argues that the ALJ misstated the medical records from her August 21, 2018 visit to Dr. McCoomer. Doc. 8 at 12 ("[T]he ALJ's assertion that Ms. Natal's gait and stance were normal is inaccurate."). The court agrees because the record clearly notes "**gait and stance abnormal**." R. 426. However, this was only one statement of many the ALJ made in his analysis. *See* R. 22–23. The ALJ also referenced full range of motion, normal muscle tone, over the counter pain medications, physical therapy, joint injections, and exercise when making his findings. R. 22–23. Additionally, later medical records from CRNP Walters do show normal gait. *See, e.g.*, R. 482–83, 485, 488–89.

Ms. Natal also identifies multiple items in the medical records that she claims the ALJ failed to mention in his decision. *See* Doc. 8 at 11–17. However, the ALJ was not required to specifically refer to every piece of evidence in his decision. *Jacobus*, 664 F. App'x at 776. The ALJ's decision indicates that he considered the medical evidence as a whole and did not broadly reject the evidence in the record.

The ALJ was not "clearly wrong" to discredit Ms. Natal's subjective complaints. *See Werner*, 421 F. App'x at 938–39. Additionally, Ms. Natal has pointed to no evidence that would compel a different conclusion from that found by the ALJ. There is no evidence in the record to support Ms. Natal's testimony that her degenerative disc disease prevents medium work with the restrictions identified by the ALJ. Accordingly, there is no error in the ALJ's consideration of Ms. Natal's subjective complaints.

### C. Consideration of Obesity as Severe Impairment and Pursuant to SSR 19-2p

The second step of the sequential disability evaluation requires the ALJ to consider the combined severity of the claimant's medically determinable physical and mental impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable impairment is severe if it significantly limits a claimant's physical or mental abilities to do basic work activities and lasts at least twelve months. *See* 20 C.F.R. § 404.1520(c)–(d). If a claimant does "not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . , or a

combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled." 20 C.F.R. § 404.1520(a)(4)(ii). "The finding of any severe impairment . . . is enough to satisfy step two because once the ALJ proceeds beyond step two, he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." *Burgin v. Comm'r*, 420 F. App'x 901, 902 (11th Cir. 2011). "Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe." *Heatly v. Comm'r*, 382 F. App'x 823, 824–25 (11th Cir. 2010) (stating "all that step two requires" is that the ALJ concluded the claimant "had a severe impairment").

With respect to obesity, applicable regulations provide that the ALJ must "consider all evidence from all sources" and assess the claimant's residual functional capacity to "show the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment." Social Security Ruling 19-2p, 2019 WL 2374244, at *3–*4 (May 19, 2019) ("SSR 19-2p"). If the claimant's obesity "significantly limits his or her physical or mental ability to do basic work activities," the ALJ will find the impairment is severe. *Id.* at *3.

Ms. Natal argues that the ALJ failed to consider the effects of her obesity as a severe impairment. Doc. 8 at 6, 14, 16. She also argues that that the residual functional capacity does not include "appropriate accommodations for . . . obesity,"

the ALJ "lessen[ed] the effects of Ms. Natal's obesity" by not contacting Dr. Banks "to obtain an explanation" related to his notation of obesity, and the ALJ's failure to note references to Ms. Natal's obesity in the medical records is proof he failed to consider obesity as a severe impairment. *Id.* at 6, 13–14, 16. The Commissioner argues that the ALJ did not commit error at "step two of the sequential evaluation because he found [Ms. Natal] had severe impairments and continued to the subsequent steps of the sequential evaluation." Doc. 10 at 18. Additionally, the Commissioner argues that "substantial evidence supports the ALJ's finding that [Ms. Natal] did not have severe obesity." *Id.* at 17.

In his decision, the ALJ determined Ms. Natal's obesity was not a severe impairment because it did not "preclude work-related activities." R. 20. In his discussion of residual functional capacity, the ALJ specifically mentioned Ms. Natal's "BMI [of] 37.5 which is considered obese." R. 23. Next, the ALJ specifically discussed the application of SSR 19-2p. R. 23. The ALJ stated:

> However, there is no evidence that [Ms. Natal's] obesity has any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning. No functional limitations are established in conjunction with obesity. [Ms. Natal] has not established that obesity is severe within the meaning of 20 CFR 404.1521 and 416.921.

R. 24.

As an initial matter, the ALJ identified Ms. Natal's degenerative disc disease/lumbago as a severe impairment. R. 20. Therefore, the ALJ satisfied step

two of the sequential disability analysis. Ms. Natal's argument that the ALJ erred by not categorizing obesity as severe fails.

Ms. Natal's argument that the ALJ did not properly consider her obesity also fails because substantial evidence supports the ALJ's application of SSR 19-2p. As noted above, the ALJ specifically cited SSR 19-2p in explaining how to consider how Ms. Natal's obesity affects her ability to perform work activities. R. 23–24. Additionally, Ms. Natal did not prove her obesity was a severe impairment, which was her burden. Ms. Natal did not establish that her obesity imposed limitations beyond those included in the residual functional capacity. And, the medical records cited by Ms. Natal do not support limitations beyond those in the residual functional capacity. Instead, they are simply references to Ms. Natal's BMI or the fact of her obesity; they do not discuss limitations as a result of her obesity. *See* R. 427 ("**patient obese**"), 445 ("Obese"), 457 ("**patient obese**"), 462 ("**Overweight (BMI 25.0-29.9)** . . . Chronic, Unchanged, Onset Date: 08/21/2018")), 470 (same), 482 ("BMI: 35.2"), 485 ("BMI: 34.70"), 488 ("BMI: 34.57"), 491 ("BMI: 34.12"); *see* Doc. 8 at 16. Thus, the ALJ's assessment of Ms. Natal's obesity was proper under both the sequential disability evaluation and SSR 19-2p.

## VI.    Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 9th day of December, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE